UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- x

NANCY MCNAMARA, Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiff,

    vs.

JPMORGAN CHASE & CO., J.P. MORGAN
SECURITIES LLC, and JPMORGAN CHASE
BANK, N.A.,

                  Defendants.

---------------------------------------------------- x

Case No.

<u>CLASS ACTION</u>

COMPLAINT

<u>DEMAND FOR JURY TRIAL</u>

By and through her undersigned counsel, Plaintiff Nancy McNamara ("Plaintiff"), individually and on behalf of herself and all others similarly situated, brings this action against JPMorgan Chase & Co. ("JPMorgan Chase"), its subsidiary J.P. Morgan Securities LLC ("JPMS" or "J.P. Morgan Securities"), and its principal bank subsidiary JPMorgan Chase Bank, N.A. ("JPMCB" or "JPMorgan Chase Bank") (collectively, "Defendants" or "J.P. Morgan"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, including, without limitation, review and analysis of: (a) documents created and distributed by Defendants; (b) public filings made by J.P. Morgan with the U.S. Securities and Exchange Commission ("SEC"); (c) press releases disseminated by Defendants; and (d) news articles, websites, and other publicly available information concerning Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This case arises out of Defendants' cash sweep program, whereby J.P. Morgan Securities, while acting as an agent and fiduciary, automatically "sweeps" uninvested cash balances from customers into low interest-bearing bank accounts at its affiliated bank, JPMorgan Chase Bank (the "Cash Sweep Program").

2.    Through the Cash Sweep Program engineered by J.P. Morgan, Defendants have reaped massive profits for themselves at the expense of their customers. JPMorgan Chase Bank invests the cash of J.P. Morgan Securities customers for its own benefit to support its lending and investment activities. J.P. Morgan keeps the spread between what it earns on customers' cash and the amount it pays customers as net interest income. During the rising interest rate environment from March 2022 through the present, the net interest income that J.P. Morgan has earned on its customers' cash has grown exponentially.

3.      Rising interest rates should have presented an opportunity for JPMS customers to earn more on their uninvested cash.  However, the customers to which JPMS owe fiduciary duties did not receive appropriate returns consistent with Defendants' fiduciary duties and contractual obligations as their cash is transferred to deposit accounts that did not pay interest rates consistent with Defendants' fiduciary duties and contractual obligations.  By improperly keeping the interest rates paid on cash sweep accounts low and funneling the interest profit to its affiliate bank, unfortunately, it is Defendants and not their customers that continue to derive the benefits from the Cash Sweep Program.

4.      Pursuant to its agreements with customers and the applicable laws, JPMS is required to act as an agent and a fiduciary in the best interests of its clients.  The JPM Deposit Account Agreement, setting forth the terms of the Cash Sweep Program, specifically provides that JPMS act as the "exclusive agent" with "respect to all transactions relating to" the Cash Sweep Program.  J.P. Morgan's Code of Conduct further acknowledges that "[o]ur firm often has fiduciary obligations to our clients to act in their best interest."

5.      Rather than fulfill its fiduciary duties to its customers and its contractual obligations, JPMS continues to engineer transactions with JPMCB that shift the compensation that customers should receive in cash sweep accounts to its affiliated entity.  JPMS automatically sweeps the uninvested cash to JPMCB by way of default and fails to negotiate with its affiliate for a reasonable rate of interest on behalf of its customers.  While other banks have engaged in arms-length transactions with unaffiliated banks that pay reasonable rates of interest under their cash sweep program, JPMS has inappropriately taken the side of its affiliate JPMCB.  As a result, JPMS in concert with JPMCB, has allowed its affiliate bank to shortchange its customers and profit from the difference between what it earns on customers' cash and the amount it pays customers.

6.     To obscure its misconduct from its customers, Defendants have also failed to disclose material information about the Cash Sweep Program to its customers, including the extent to which it was laboring under a conflict of interest with its affiliate banks.  Defendants have concealed the substantial benefits they extracted by negotiating one-sided transactions with their affiliate, and misled investors into believing the conflict was absolved through JPMS's "waiver" of fees, when in reality, those fees were passed onto its affiliated bank, and not their customers.

## II.     JURISDICTION AND VENUE

7.     This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), as amended by the Class Action Fairness Act of 2005.  There are at least 100 members in the proposed class, the aggregated claims of the individual class members exceed $5,000,000, exclusive of interests and costs, and at least one or more members of the proposed Class is a citizen of a different state than at least one Defendant.

8.     The Court has personal jurisdiction and venue over Defendants because JPMorgan Chase and J.P. Morgan Securities have their principal place of business and are headquartered in New York, and regularly transact business in this District.

9.     Venue is also proper in this District under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims at issue occurred in this District and because Defendants are subject to the personal jurisdiction of this Court.

## III.    PARTIES

### A.     Plaintiff

10.    Plaintiff Nancy McNamara is a citizen of Ohio, and a customer and account holder of J.P. Morgan Securities.

11.    Between February 2022 and March 2024, Plaintiff maintained an account with JPMS in which cash was held over the course of the life of the account, and cash balances were

- 3 -

automatically "swept" into a low interest-bearing bank account at JPMCB pursuant to J.P. Morgan's Cash Sweep Program.

**B.    Defendants**

12.    Defendant JPMorgan Chase & Co. is a leading financial services firm based in the United States of America with operations worldwide.  It is a holding company that conducts business through its subsidiaries including Defendant JPMS.  JPMorgan Chase provides a variety of financial services to consumers, small businesses, large corporations, governments, and other clients, including brokerage, consumer banking, investment banking, commercial banking, and asset management.  JPMorgan Chase is a Delaware corporation with its headquarters in this District.

13.    Defendant J.P. Morgan Securities LLC is a broker-dealer and investment advisor registered with the SEC.  JPMS is also a member of the Financial Industry Regulatory Authority ("FINRA") and Securities Investor Protection Corporation (SIPC).  JPMS provides brokerage and investment advisory services, including offering full-service investment advisory accounts through discretionary or non-discretionary programs.  It is a Delaware limited liability company headquartered in New York, New York, and a wholly-owned subsidiary of JPMorgan Chase & Co.

14.    Defendant JPMorgan Chase Bank, N.A. is JPMorgan Chase's principal bank subsidiary.  While the investment advisory services are offered through JPMS and J.P. Morgan Private Wealth, bank-managed investment advice is offered through JPMorgan Chase Bank, N.A. national banking association with U.S. branches in 48 states and Washington, D.C.

IV.     **FACTUAL BACKGROUND**

   A.     **Defendants' Fiduciary Duties to Its Clients**

15.     JPMorgan Chase, through JPMS, offers brokerage and investment advisory services to help its clients meet their financial goals.  Whether JPMS's customers held brokerage or investment advisory accounts, their uninvested cash was automatically swept pursuant to the Cash Sweep Program.

16.     Investment advisory services, including full-service investment advisory accounts, "are offered through J.P. Morgan Securities LLC and J.P. Morgan Private Wealth Advisors LLC and bank-managed investment advice is offered through JPMorgan Chase Bank, N.A."

17.     As a registered broker-dealer and investment adviser with the SEC, JPMS owes fiduciary duties to its customers, including a duty to act in the best interests of its clients, and to place the best interests of its customers ahead of its own self-interest.  With respect to its investment advisory services, JPMS acknowledges in its Form Client Relationship Summary ("CRS") "[w]hen you receive investment advice from us, we are subject to an ongoing duty of loyalty and care and must not place our interests ahead of yours."[1]  Similarly, JPMS assures its brokerage customers that its recommendations will be made "in your best interest."

   1.     **Defendants' Duties as an Investment Adviser**

18.     Investment advisers such as JPMS are fiduciaries under the Investment Advisers Act of 1940 (the "Investment Advisers Act").  *See SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 194 (1963); *see also* Securities and Exchange Commission Interpretation Regarding Standard of Conduct for Investment Advisers, Securities Act Release No. 5248, Investment Company Act

---

[1]  *See* "J.P. Morgan Securities LLC – Client Relationship Summary," J.P. Morgan, https://secure.chasecdn.com/content/services/structured-document/document.en.pdf/dao/form-crs-jp-morgan-securities.pdf (last visited Dec. 6, 2024).

No. 5248, 2019 WL 3779889, at *1 (June 5, 2019) ("Under federal law, an investment adviser is a fiduciary.").

19.    The investment adviser's fiduciary duty "is broad and applies to the entire adviser-client relationship."  This fiduciary duty is "based on equitable common law principles and is fundamental to advisers' relationships with their clients under the Advisers Act."  *Id*. at *2.

20.    The fiduciary duty an investment adviser owes to its client under the Investment Advisers Act specifically encompasses a duty of care and duty of loyalty.

21.    As the SEC has stated, "[t]his means the adviser must, at all times, serve the best interest of its client and not subordinate its client's interest to its own.  In other words, the investment adviser cannot place its own interests ahead of the interests of its client."  *Id.* at *3.

22.    Under an investment adviser's duty of loyalty, "an investment adviser must eliminate or make full and fair disclosure of all conflicts of interest which might incline an investment adviser – consciously or unconsciously – to render advice which is not disinterested such that a client can provide informed consent to the conflict."  If there is a conflict, an investment adviser "must make full and fair disclosure to its clients of all material facts relating to the advisory relationship."  *Id.* at *3, *8.

23.    The investment adviser's duty of care includes among other things: "(i) the duty to provide advice that is in the best interest of the client, (ii) the duty to seek best execution of a client's transactions where the adviser has the responsibility to select broker-dealers to execute client trades, and (iii) the duty to provide advice and monitoring over the course of the relationship."  *Id.* at *4.

### 2.    Defendants' Duties Under Regulation Best Interest

24.    Similar duties are imposed on J.P. Morgan under broker-dealer law.  Assuming that J.P. Morgan is not acting as an investment adviser but instead in its capacity as a broker-dealer,

J.P. Morgan is still obligated to act in its clients' best interests under Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33381-01 (July 12, 2014) ("Reg. BI"). *See* 17 C.F.R. §240.151-1.

25.     Although the specific application of Reg. BI and the fiduciary standard under the Investment Advisors Act may differ in some respects, "they generally yield substantially similar results in terms of the ultimate responsibilities owed to retail investors."[2]

26.     Under Reg. BI, "a broker-dealer must act in the retail customer's best interest and cannot place its own interests ahead of the customer's interests" when making a recommendation. 84 Fed. Reg. at 33320.

### 3.     Defendants' Duties Under the Account Agreements

27.     The J.P. Morgan Investment Account Agreements and Disclosures Booklet "contain the general terms and conditions, account agreements and disclosures that apply to the accounts offered by [J.P. Morgan Wealth Management] through J.P. Morgan Securities LLC" (the "JPMS Account Agreements").

28.     The JPMS Account Agreements incorporate the "JPMorgan Chase Deposit Account," with the terms described in a document titled "The JPMorgan Chase Deposit Account" (the "JPM Deposit Account Agreement" and together with the JPMS Account Agreements, the "Program Documents").

29.     The JPM Deposit Account Agreement purportedly "describes the JPMorgan Chase Deposit Account feature," sets forth the terms of the Cash Sweep Program, and grants JPMS the consent to act on behalf of its customers.  As the JPM Deposit Account Agreement provides,

---

[2] *See* SEC Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Care Obligations, SEC (last updated Apr. 30, 2024), www.sec.gov/tm/standards-conduct-broker-dealers-and-investment-advisers.

"[s]election of the Deposit Account for the sweep of available cash in your account will be deemed your acknowledgement and consent to the features and terms of the Deposit Account."

30.     The JPM Deposit Account Agreement also establishes a fiduciary and agency relationship between Defendants and the proposed class.  The JPM Deposit Account Agreement states that "JPMS acts *as exclusive custodian and agent* with respect to all transactions relating to the Deposit Account feature of customers' JPMS accounts."

31.     As the JPM Deposit Account Agreement acknowledges, "you [the customer], not JPMS, are the owner of your funds on deposit with JPMCB."  When the deposit account for the automatic investment or "sweep" of available cash held in customers' JPMS account is selected, "such balances are remitted for deposit *by JPMS, acting as your agent*, into a Demand Deposit Account maintained at JPMCB."

32.     By entering a custodial and agency relationship with Plaintiff and members of the putative Class, Defendants assumed fiduciary duties including the duty of loyalty, the duty of care, the duty to act in good faith, the duty of full and fair disclosures, and the duty to make prudent investment recommendations.  These fiduciary duties are meant to always ensure Defendants act with integrity and in the best interests of the client.

33.     Pursuant to the JPM Deposit Account Agreement, JPMS was contractually required to act as an agent on behalf of members of the Class with respect to their cash sweep transactions, and were thus contractually obligated to obtain, through such transactions, rates of return on their cash balances that were reasonable.

34.     The JPM Deposit Account Agreements also expressly incorporates "all applicable laws, rules, regulations of federal and state authorities and self-regulatory agencies" including, but

not limited to, the SEC and FINRA.  FINRA Rule 2122 expressly provides that "[c]harges, if any, for services performed . . . shall be reasonable and not unfairly discriminatory among customers."

35.    The JPM Account Agreements also contain a choice of law provision, which provides, in relevant part, that "this Booklet, Other Important Account Documents and your Accounts shall be governed by Applicable Law" and "its enforcement shall be governed by, and construed in accordance with, the laws of the State of New York [except expressly stated otherwise]."

### 4.    Defendants' Code of Conduct

36.    Defendants' fiduciary duties to their customers are further reflected in their Code of Conduct, applicable "to the employees and directors of JPMorgan Chase & Co. . . . and its direct and indirect subsidiaries."[3]

37.    As affirmed and signed by JPMorgan Chase Chief Executive Officer Jamie Dimon, the Code of Conduct "represents our shared obligation to operate with the highest level of integrity and ethical conduct."

38.    Section 1.1 of the Code of Conduct, which addresses "Our Ethics," states that "JPMorganChase is committed to ensuring employees act with honesty and integrity, treat customers fairly, and exercise sound judgment."  Section 1.2 and 1.3 go on to emphasize the importance of complying with applicable laws and firm policies, as well as dealing fairly with customers:

> The financial industry is highly regulated. ***Being aware of and complying with the laws and regulations under which we operate is not just a critical part of our business, but fundamental to who we are. It is important to comply with the letter, spirit, and intent of laws, regulations,***

---

[3]    *See* "Our Code of Conduct 2024," JPMorgan Chase (July 2024), https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/documents/code-of-conduct.pdf.

***and firm policies***. Violating the law or engaging in unfair, deceptive, and abusive acts or practices may weaken customer confidence, put our reputation at risk, impact market integrity, or result in regulator criticism, legal action, fines or penalties, or other negative repercussions.

You are expected to know and comply with the laws, regulations and firm policies that apply to you. Always follow the Code.

*    *    *

***Always deal fairly and in good faith with our customers***, suppliers, competitors, business partners, regulators, and other employees. ***Never take unfair advantage of anyone*** through manipulation, concealment, abuse of privileged or confidential information, misrepresentation of material fact, ***or any other unfair dealings or practices***.

39.     Section 2.1 underscores Defendants' fiduciary obligations and prescribes that employees, "avoid[] conflicts of interest."  It states specifically "[o]ur firm ***often has fiduciary obligations to our clients to act in their best interest***, by which you [our employee] should abide."

40.     As alleged herein, Defendants systematically and repeatedly violated their own Code of Conduct through their operation of the Cash Sweep Program by placing their own self-interests ahead of their customers.

## B.     The Cash Sweep Program

41.     In a typical cash sweep account for an investment advisory account customer, the firm moves uninvested cash (e.g., incoming cash deposits, dividends, or certain investment returns) from the customer's account to a money market mutual fund or a bank whose deposits are insured by the Federal Deposit Insurance Corporation ("FDIC").

42.     Cash sweep accounts are intended to convert idle cash into interest-bearing investment vehicles.  As J.P. Morgan explains on its website, "[c]lients with investment accounts

- 10 -

serviced by a J.P. Morgan Adviser can ***earn a return on available cash balances by choosing to automatically sweep these balances***."[4]

43.     Defendants implemented the Cash Sweep Program ostensibly to offer JPMS's customers an interest paying vehicle on cash deposits that is FDIC insured.  However, the real purpose was to provide benefits to J.P. Morgan and its affiliates.  In fact, the JPM Deposit Account Agreement provides that "[a]ny amounts, including interest, ***in excess of $250,000 are not covered by FDIC insurance***," and that amount of available FDIC insurance protection may be reduced by the balances in other accounts:

> Since your Deposit Account balances will be aggregated with all other deposits you maintain with JPMCB in the same legal capacity, the ***insurance protection available for your Deposit Account balances may be reduced by balances in any other accounts or deposits***, including CDs, you maintain with JPMCB.

44.     According to J.P. Morgan's website, clients with investment accounts serviced by a J.P. Morgan Adviser could have had "their cash balances automatically swept into the JPMorgan Chase Deposit Account, a bank deposit sweep or one of the available money market fund sweeps."[5]

45.     In actuality, however, the JPMorgan Chase Deposit Account (the "Deposit Account") was the default cash sweep account program for U.S. customers.  Those cash balances were automatically swept into deposit accounts at JPMorgan Chase Bank, JPMS's affiliate bank, unless the customer affirmatively selected an alternative.

---

[4]     *See* "Sweep Yields," J.P. MORGAN WEALTH MANAGEMENT, https://www.chase.com/personal/investments/sweep-options-yields (last visited Dec. 5, 2024).

[5] *Id.*

46.    The most recent version of J.P. Morgan's Form ADV Part 2A – Wrap Fee Program Brochure ("Form ADV"), which gives information "about the qualifications and business practices of JPMS" for its investment advisory provides:

> **The Deposit Account is the default "sweep" option for Program clients** . . . who do not select an available "sweep" alternative or if the sweep selected is no longer available.

47.    The JPM Deposit Account Agreement also states that JPMCB – JPMS's affiliated bank – was the **only option** for the Cash Sweep Program:

> **Deposits**
>
> When you select the Deposit Account for the automatic investment or "sweep" of available cash held in your JPMS account, such balances are remitted for deposit by JPM, acting as your agent, into a Demand Deposit Account maintained at JPMCB.

48.    The JPM Deposit Account Agreement provides that "[t]he interest rate paid on Deposit Account balances will vary based on business and economic conditions . . . [and] is reset periodically at the discretion of Chase Bank."  Accordingly, customers expected, based on this term in the JPM Deposit Account Agreement and JPMS's role as an agent and fiduciary, that interest rates paid by J.P. Morgan would be determined by a reasonable arm's-length negotiation based on the prevailing interest rate environment.

49.    JPMS also promised in its Deposit Account Agreement to use its discretion in modifying the terms of the Cash Sweep Program:

> JPMCB or **JPM, in its discretion, may modify the terms**, conditions and procedures relating to the Deposit Account. . . .  **JPMS may amend the features of the Deposit Account by adding or removing depository institutions.**

50.    As an agent and fiduciary, JPMS should have exercised this discretion to benefit its customers, including changing the terms of the Cash Sweep Program or the default products available, but instead did so to benefit itself and its affiliates.

- 12 -

1. **JPMS's Conflict of Interest**

51. At the same time JPMS was acting as its customers' agent and fiduciary in connection with the Cash Sweep Program, it was also beholden to its affiliate bank, JPMCB. Indeed, the rate of interest was "***reset periodically at the discretion of [JPMCB]***," and not JPMS.

52. Defendants acknowledge this conflict in the Form ADV, stating "***JPMS and JPMCB have a conflict of interest in offering or utilizing the Deposit Account (and in making it the default 'sweep' option***." However, as explained below, Defendants failed to fully disclose the extent of the conflict and its ramifications or prevent it from harming the customers to which they owe fiduciary duties.

53. While the conflict of interest is not expressly mentioned nor adequately explained in the JPM Deposit Account Agreement, JPMS's opportunity to profit from the Cash Sweep Program is alluded to in a section titled "Other Benefits to J.P. Morgan."

C. **J.P. Morgan Fails to Provide Clients with Reasonable Rate of Interest**

54. JPMS breached its duties and contractual obligations by failing to negotiate a higher and reasonable rates of interest for its customers' balances in the Cash Sweep Program.

55. As an agent and fiduciary, JPMS was contractually and legally obligated to act in the best interest of its clients. JPMS's failure to negotiate significantly higher interest rates on the cash for which it automatically placed by default into the account of its affiliate bank was against its clients' best interests.

56. Instead of fulfilling these obligations, JPMS allowed its affiliate bank JPMCB to extract excessive compensation by paying JPMS clients unreasonably low interest rates. JPMS sided with its affiliated banks and rather than negotiate on behalf of its customers, allowed JPMCB to effectively negotiate the rate of interest.

57. Contrary to the JPM Deposit Account Agreement, JPMS did not change the terms or features of the Cash Sweep Program to benefit its clients, but instead has worked in concert with its affiliated bank to set artificially low interest rates for Deposit Accounts in the Cash Sweep Program. JPMS promised in the JPM Deposit Account Agreement that it would act as an "***exclusive custodian and agent***" to its customers with respect to the Cash Sweep Program, but in actuality, it continues to serve another principal – JPMCB.

58. From 2018 to 2019, and again from March 2022 to August 2024, the Federal Reserve began significantly raising the effective federal funds rate (the "Federal Funds Rate").

59. The federal funds market consists of domestic unsecured borrowings in U.S. dollars by depository institutions from other depository institutions and certain other entities, primarily government-sponsored enterprises. In other words, the Federal Funds Rate is the interest rate charged by banks to borrow from each other overnight. The effective Federal Funds Rate is calculated as a volume-weighted median of such overnight federal funds transactions.

60. By August 2024, the effective Federal Funds Rate had risen to 5.33%. As the Federal Reserve began raising the federal rate beginning in 2018 through 2024 – up from .08% in 2022 to 5.33% in August 2024 – Defendants deliberately kept the rates on the Cash Sweep Program lower so as to extract the benefits for themselves.

61. Other metrics, including the yield on short-term U.S. Treasury Bills further demonstrate that the rates J.P. Morgan paid on the Cash Sweep Programs were unreasonably low. U.S. Treasury Bills ("T-bills") are short-term securities issued by the U.S. Department of the Treasury with maturities ranging from four to 52 weeks. T-bills are issued at a discount from the face value, and when they mature, the investor is paid the face value.

62.     Treasury Bills are considered safe investments because they are backed by the U.S. government, but generally carry low rates of return.  Nevertheless, the yield on the shortest term (one month) U.S. Treasury Bill has steadily increased from close to zero in 2021 to approximately 5.5% in mid-2023, and has remained at that level through August 2024.

**D.     The Cash Sweep Program Unfairly Benefits J.P. Morgan**

63.     The Cash Sweep Program primarily benefits JPMS and its affiliates to the detriment of its customers.

64.     JPMS remits all available cash swept into a deposit account maintained at JPMCB (the "Deposit Account").  JPMCB substantially benefits from the Deposit Account because, through the Deposit Account, JPMCB is able to "receive[] a stable, cost-effective source of funding."

65.     The customer deposits in the Deposit Account are used by JPMCB "to fund current and new businesses, including lending activities and investments."

66.     JPMCB generates profits based on the "spread" between the interest rate it pays to the clients and the interest rate and other income it is able to earn through its lending and investment activities.  As the JPM Deposit Account Agreement explains:

> The profitability on such lending activities and investments is generally measured by the difference, or "spread," between the interest rate [paid on the deposits] and other costs associated with the Deposit Account by JPMCB, and the interest rate and other income earned by JPMCB on the loans and investments made with the deposits.

67.     The revenue that JPMCB generates from the spread can be substantial.  In particular, by keeping the interest rates in customers' Deposit Accounts suppressed, J.P. Morgan has been able to earn a higher profit.  Indeed, as JPMS acknowledges (in its Form ADV but not in the JPM Deposit Account Agreement), the "income that JPMCB earns through its lending and

investing activities *is usually significantly greater than the interest earned by clients through the Deposit Account*."

68.     Specifically, J.P. Mogan earned and recorded in its earnings statements net interest income – the difference between the interest the bank earned on loans and investments and the amount paid out to depositors.

69.     The net interest income Defendants earned was a staggering $62.4 billion in 2022, up 40% from the prior the year.  Net income interest increased by more than *58%* from $52.3 billion in 2021 to $90 billion in 2023.

70.     As these record profits show, Defendants were financially incentivized to maintain the artificially low interest rates on sweep accounts to keep the spread as high as possible, thwarting Plaintiff and the Class from receiving a reasonable rate of interest.

71.     JPMS paid its customers unreasonably lower rates of interest, and then shifted to its affiliate JPMCB, a substantial portion of the beneficial returns on its customers' cash that they otherwise would have been entitled to under the Cash Sweep Program.  Thus, JPMS breached and continues to breach its fiduciary duties to its customers, when it puts the interests of J.P. Morgan and affiliates first, and not its customers, while entering into transactions with JPMCB regarding the Cash Sweep Program.

### E.     Defendants Continue to Affirmatively Make Materially Misleading Statements and Omit Material Facts Regarding the Cash Sweep Program

72.     As an investment adviser and as a broker-dealer, J.P. Morgan had a fiduciary duty to not make any untrue statements or omissions of material fact that are otherwise false or misleading.  *See* FINRA Rule 2210(d)(1) – Communications with the Public ("No member may publish, circulate or distribute any communication that the member knows or has reason to know contains any untrue statement of a material fact or is otherwise false or misleading.").

73.    The Member Firm Regulation Division of the New York Stock Exchange ("NYSE") emphasized the particular importance of adequate disclosures of cash sweep programs in its Information Memo 05-11, dated February 15, 2005 (the "Information Memo").    The Information Memo states "[i]n some cases . . . cash sweep account programs at member organizations *may have been instituted or changed without fully appropriate levels of disclosure and customer consent*."    NYSE expressed concern that certain Cash Sweep Programs changes "*may be so significant and beyond the contemplation and reasonable expectations of the customer*" that "*effective subsequent disclosure*" was required.

74.    J.P. Morgan's Program Documents contain material omissions by failing to disclose that Defendants established and maintained the Cash Sweep Program to enrich themselves by paying unreasonably low interest rates to customers.

75.    As NYSE explains, this disclosure is critical due to the potential conflict between investment advisers' fiduciary obligations and its financial incentives:

> While a registered investment company . . . . is bound by fiduciary obligations to its shareholders (customers of the member organization) to seek the highest rates prudently available (less disclosed fees and expenses), when customer funds are swept to an affiliated bank *it is in the interest of the member organization and its affiliates to pay as low a rate as possible*.

76.    The SEC similarly highlighted that "cash sweep programs" are a "common source[] of conflicts of interest" in its Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Conflicts of Interest, issued August 3, 2022.

77.    The Information Memo recommended a series of "best practices" – based on NYSE Rules – that were "designed to safeguard investor interests for [cash sweep] programs currently in place."    According to the NYSE, failure to follow the practices set forth in the Information Memo may be deemed "conduct inconsistent with good business practice" and/or "with just and equitable principles of trade."

- 17 -

78.    The Information Memo specifically provided that member organizations "***must include in their agreements or disclosure documents any conflicts of interest*** in connection with the cash sweep program," including the following:

> whether the member organization receives compensation or other benefits for customer balances maintained at the bank, and if so the expected range of such compensation, as well as a disclosure of the difference, if any, between the rates of return at the existing money market fund and the proposed bank sweep fund.

79.    JPMS failed to disclose it was laboring under the exact conflicts of interest that the Information Memo warned against.  Unbeknownst to customers, JPMS was not negotiating interest rates with JPMCB for the benefit of its customers, but rather, those negotiations were one-sided and inured to JPMCB's benefit.

80.    The JPM Deposit Account Agreement states: "The interest rate paid on Deposit Account balances will vary based on business and economic conditions and . . . is reset periodically at the discretion of JPMCB."  This was false and misleading, as the interest rates on the Cash Sweep Program were below market rates, driven by conflicts with JPMCB, and not tied to business and economic conditions.

81.    The Program Documents are also completely silent as to how much J.P. Morgan actually benefits from the Cash Sweep Programs.  The documents specifically do not disclose the interest that JPMCB earns on its lending activities and investments nor the spread between the interest rate in the Deposit Accounts and the interest earned by JPMCB.

82.    The JPM Deposit Account Agreement merely states:

> The income that JPMCB will have the opportunity to earn through its lending and investing activities is usually greater than the fee earned by JPMorgan Chase & Co. and its affiliates from managing and distributing the money market funds that may be available to you as an alternative cash "sweep" for your JPMS account.

- 18 -

83.    Tellingly, the JPM Deposit Account Agreement does not make any mention of how the income or interest earned by JPMCB compares to the interest earned by its customers in the Cash Sweep Programs.  The Form ADV which is not part of the Program Documents provided to customers states:

> The income that JPMCB earns through its lending and investing activities is usually significantly greater than the interest earned by clients through the Deposit Account.

84.    The JPM Account Agreements taken as a whole omit the actual proportions that JPMS allows JPMCB to retain on JPMS's customers' cash in the Cash Sweep Programs and the returns that JPMS's customers receive.  In contravention of the Information Memo, absent from the JPMS Account Agreements is the actual or expected range of benefits or compensation that J.P. Morgan stood to receive.

85.    Furthermore, JPMS's disclosure in the Form ADV makes it appear to customers that the conflict is eliminated by JPMS waiving its fee for managing the Cash Sweep Program. The Form ADV states as follows:

> Additionally, JPMCB has agreed to pay JPMS a monthly flat fee for each account that uses the Deposit Account; however, JPMS is currently waiving receipt of this fee.

86.    This statement is misleading because while JPMS declines its customary compensation, the benefits of the Cash Sweep Program are passed onto its affiliates, rather than its fiduciary customers.  JPMS could have charged its monthly flat fee and passed that onto its customers, but by declining the fee, JPMS allowed JPMCB to retain the benefits from the Cash Sweep Program for itself, at the expense of its customers.

87.    Defendants also failed to disclose the interest rates that the Cash Sweep Program offers, instead only including a link to its website in the JPM Deposit Account Agreement, which provides the interest rate for only a "7-Day SEC Yield."

88.     Defendants also never disclosed the interest rates that customers could have earned if their sweep funds had been invested in comparable accounts with non-affiliated banks.

## V.    CLASS ACTION ALLEGATIONS

89.     Plaintiff re-alleges and incorporates by reference the allegations set forth above. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3), on behalf of the Class consisting of:

> **Nationwide Class**:
>
> All persons who held cash positions in accounts custodied in the United States by Defendants, and whose cash was subject to J.P. Morgan's Cash Sweep Program.
>
> **Ohio Sub-Class**:
>
> All Ohio residents who held cash positions in accounts custodied in the United States by Defendants, and whose cash was subject to J.P. Morgan's Cash Sweep Program.

90.     Excluded from the Class are Defendants, including J.P. Morgan and any of its affiliates and their officers and directors.

91.     Plaintiff reserves the right to amend the Class definition upon conducting further investigation or discovery.

### A.    Numerosity

#### 1.    Rule 23(a)(1)

92.     The members of the Class and Sub-Class are so numerous that joinder of all members is impracticable and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

93.     J.P. Morgan, including JPMS, has thousands of customers nationwide.  Defendants oversee more than $4.2 trillion in client assets through the work of thousands of financial advisors. The Class thus satisfies the numerosity requirement of Federal Rule 23.

94.     Members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail or electronically.  Defendants regularly communicates with the Class by mail and/or electronically.

**2.      Existence and Predominance of Common Questions of Law and Fact Pursuant to Rule 23(a)(2), 23(b)(3)**

95.     Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members.  These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

(a)     Whether Defendants owed fiduciary duties to Plaintiff and the putative Class members, as alleged herein;

(b)     Whether Defendants breached their duties to Plaintiff and the putative Class members, as alleged herein;

(c)     Whether Defendants breached their contract with Plaintiff and the putative Class members regarding the Cash Sweep Program;

(d)     Whether Defendants' disclosures about the Cash Sweep Program contained material misrepresentations or omissions;

(e)     Whether Defendants were unjustly enriched by their wrongful conduct;

(f)     Whether Defendants committed gross negligence;

(g)     Whether this case may be maintained as a class action under Federal Rule of Civil Procedure 23;

(h)     Whether and to what extent Class members have sustained damages and the proper measure of damages; and

(i)     Whether and to what extent Class members are entitled to attorneys' fees and costs.

### B.    Typicality

#### 1.    Rule 23(a)(3)

96.    Plaintiff's claims are typical of the claims of the Class because she was a customer of Defendants that had her cash balances improperly managed by JPMS through its administration of the Cash Sweep Program.  Thus, Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendant's wrongful conduct, and the relief sought within the Class is common to the members of each.

### C.    Adequacy of Representation

#### 1.    Rule 23(a)(4)

97.    Plaintiff will fairly and adequately protect the interests of other Class members. Plaintiff has retained counsel competent and experienced in complex class action litigation. Plaintiff has no interests adverse or antagonistic to those of the Class.

### D.    Superiority

#### 1.    Rule 23(b)(3)

98.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

99.    Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

(a)    the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

(b)    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

### FIRST CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Asserted on behalf of the Plaintiff and the Class and Sub-Class Against Defendants)

100.    Plaintiff repeats and incorporates by reference the preceding factual allegations as if fully set forth herein.

101.    At all relevant times, Defendants owed fiduciary duties to Plaintiff and the members of the Class in connection with the Cash Sweep Program.  Such duties arose out of: applicable law and industry standards; the agency relationship between JPMS and the Class as to the Cash Sweep Program; and Defendants' exercise of control and discretion over Plaintiff's and other Class members' financial holdings.

102.    As fiduciaries, Defendants owed Plaintiff and members of the Class a duty of loyalty, a duty of care, good faith, candor, and disclosure.  Moreover, Defendants owed Plaintiff and the Class a duty to act in their best interest, including by placing the interests of their clients ahead of Defendants' own best interests.

103.    Defendants breached their fiduciary duties by the conduct alleged herein, including by designing, structuring, maintaining, and/or operating the Cash Sweep Program to benefit themselves at the expense of their fiduciary customers, providing a lower rate of interest to their

customers than they were receiving for themselves, making material misrepresentations and omissions regarding the Cash Sweep Program, violating their duty of care, and acting in their own – not their customers' – best interest with respect to the Cash Sweep Program.

104.    As a direct and proximate consequence of Defendants' conduct as alleged herein, Plaintiff and the Class suffered damages in an amount to be determined at trial, and seek disgorgement of any undue and unjust gains of Defendants, punitive damages, as well as all other equitable relief deemed just and proper.

**SECOND CAUSE OF ACTION**
**Gross Negligence**
**(Asserted on behalf of the Plaintiff and the Class and Sub-Class Against Defendants)**

105.    Plaintiff realleges and incorporates by reference the preceding factual allegations as if fully set forth herein.

106.    As set forth above, Defendants owed fiduciary duties to Plaintiff and the other members of the Class in the operation of the Cash Sweep Program.

107.    Defendants breached their duties by the conduct alleged herein, including by designing, structuring, maintaining, and/or operating the Cash Sweep Program to benefit themselves at the expense of their fiduciary customers, providing a lower rate of interest to their customers than they were receiving for themselves, making material misrepresentations and omissions regarding the Cash Sweep Program, violating their duty of care, and acting in their own – not their customers' – best interest with respect to the Cash Sweep Program.

108.    Defendants' misconduct was grossly negligent because it comprised a reckless disregard for J.P. Morgan's clients' best interests, and represented an extreme departure from the ordinary standard of care.

109.    Defendants' misconduct directly and proximately caused financial harm to Plaintiff and the other members of the Class.  As a result, Plaintiff and other Class members are entitled to damages from the Defendants, plus prejudgment interest thereon.

### THIRD CAUSE OF ACTION
### Unjust Enrichment
**(Asserted on behalf of the Plaintiff and the Class and Sub-Class Against Defendants)**

110.    Plaintiff realleges and incorporates by reference the preceding factual allegations as if fully set forth herein.

111.    Defendants, through their wrongful conduct of sweeping available cash balance from customer accounts into accounts at Defendants' affiliated bank that provided customers with inappropriately low interest rates, received net interest income, fees, and other financial benefits.

112.    As a result, Defendants were unjustly enriched by their misconduct.  Plaintiff alleges that it is inequitable and unjust for Defendants to retain these benefits, including the net interest income they earned at the expense of their own clients.

113.    Plaintiff and the other members of the Class suffered financial harm from Defendants' misconduct and are entitled to damages, including the restitution and disgorgement of the profits and other financial benefits unjustly obtained by Defendants.

### FOURTH CAUSE OF ACTION
### Breach of Contract
**(Asserted on behalf of the Plaintiff and the Class and Sub-Class Against JPMS)**

114.    Plaintiff realleges and incorporates by reference the preceding factual allegations as if fully set forth herein.

115.    Defendants' relationship with its customers is governed by a written contract, the terms of which are contained in, and incorporated into various standardized documents drafted by Defendants, including the JPM Deposit Account Agreement.  The contracts between JPMS and its accountholders are valid and binding.

116.    Pursuant to the JPM Deposit Account Agreement, Defendant JPMS undertook to act as an agent of the customers with regard to the Cash Sweep Program, and was thus contractually obligated to act in the customers' best interest and obtain for Plaintiff and the Class, through such transactions, rates of return on their cash balances that are reasonable.

117.    As set forth herein, Defendant JPMS did not act in the customers' best interests, and the rates of return paid to customers on their cash balances were not reasonable or consistent with Defendants' contractual obligations.  Accordingly, Defendants breached their contracts with Plaintiff and the members of the proposed Class.

118.    As a direct and proximate result of JPMS's breach of contract, Plaintiff and the Class sustained damages.

### FIFTH CAUSE OF ACTION
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Asserted on behalf of the Plaintiff and the Class and Sub-Class Against JPMS)

119.    Plaintiff realleges and incorporates by reference the preceding factual allegations as if fully set forth herein.

120.    JPMS accountholders entered into a written contract with JPMCB, the terms of which are contained in, and incorporated into various standardized documents drafted by Defendants, including the Program Documents.  The contracts between J.P. Morgan and its investment account customers are valid and binding.  These documents were and are, for all purposes relevant hereto, contracts between the accountholders and JPMS.

121.    Plaintiff and members of the Class paid valuable consideration in exchange for these contractual rights.

122.    Inherent in these contracts was, and is, an implied covenant of good faith and fair dealing, requiring JPMS to deal fairly with Plaintiff and other accountholders, to fulfill their

obligations to Plaintiff and Class members in good faith, and to not deprive Plaintiff and Class members of the fruits of their bargain.

123.    By failing to pay Plaintiff and the Class members a reasonable rate of interest, JPMS breached the implied covenant of good faith and fair dealing inherent in the contracts. Through the implied covenant of good faith and fair dealing, JPMS was obligated to pay Plaintiff and the members of the Class a reasonable rate of interest.  By failing to do so, JPMS violated the reasonable expectations of the members of the Class.

124.    As a direct and proximate result of JPMS's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class sustained damages.

**SIXTH CAUSE OF ACTION**
**(Asserted on behalf of the Plaintiff and the Class and Sub-Class Against Defendants)**
**Violation of New York General Business Law §349**

125.    Plaintiff repeats and realleges each of the factual allegations in the forgoing paragraphs as if fully set forth herein.

126.    The agreement between the parties giving rise to this action was made in the State of New York, and Defendants selected New York law as the law applicable to the agreement.

127.    Defendants' acts and practices with respect to the Cash Sweep Program, as described above, constitute unlawful, unfair, misleading, and deceptive business acts and practices in violation of Section 349 of New York's General Business Law ("GBL").

128.    Each of these actions alleged herein was consumer oriented and involves deceptive conduct that is recurring and has a broad impact upon the public, including Plaintiff and the Class.

129.    Plaintiff and the other members of the Class suffered an ascertainable loss as a direct and proximate result of Defendants' actions in violation of New York General Business Law.

130.    Accordingly, Plaintiff and the Class seek appropriate relief under GBL §349, including injunctive relief and damages, as well as reasonable attorneys' fees and costs.

## VI.    PRAYER FOR RELIEF

Plaintiff requests relief as follows:

A.    Actual damages;

B.    Punitive damages;

C.    Awarding disgorgement of profits obtained by Defendants as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Injunctive relief prohibiting Defendants from continuing to engage in the conduct alleged herein;

E.    Injunctive relief prohibiting Defendants from continuing to engage in the conduct alleged herein;

F.    Attorneys' fees and costs of suit;

G.    Prejudgment interest; and

H.    Such other relief as the Court deems just and proper.

## VII.    DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

DATED:  December 11, 2024                    Respectfully submitted,

_s/ Alexander E. Barnett_
ALEXANDER E. BARNETT

Alexander E. Barnett (Bar No. 2522696)
Bruce D. Bernstein (Bar No. 2886182)
Jarett N. Sena (Bar No. 5446380)
**DiCELLO LEVITT LLP**
485 Lexington Ave., Suite 1001
New York, NY  10017
Tel.: (646) 933-1000
abarnett@dicellolevitt.com

- 28 -

bbernstein@dicellolevitt.com
jsena@dicellolevitt.com

Brian O. O'Mara (*pro hac vice* forthcoming)
Steven M. Jodlowski (*pro hac vice* forthcoming)
**DICELLO LEVITT LLP**
4747 Executive Dr., Suite 240
San Diego, CA  92121
Tel.:  (619) 923-3939
briano@dicellolevitt.com
stevej@dicellolevitt.com

Adam J. Levitt (Bar No. 5126602)
Daniel R. Schwartz (Bar No. 5406012)
**DICELLO LEVITT LLP**
Ten North Dearborn St., Sixth Floor
Chicago, IL  60602
Tel:  (312) 214-7900
alevitt@dicellolevitt.com
dschwartz@dicellolevitt.com

*Counsel for Plaintiff and the Proposed Class*